# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LEVAR JOHNSON,

       **Plaintiff,**

  **v.**                                **Case No. 13-CV-699**

WILLIAM POLLARD, DR. RICHTER,
J. ZWIERS, TOM GOZINSKE,
ISMAEL OZANNE, CYNTHIA THORPE,
and CATHY FRANCOIS,

       **Defendants.**

## DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Levar Johnson ("Johnson"), a Wisconsin state prisoner, filed this civil rights action under 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. Johnson claims that the defendants delayed referring him to a medical specialist for his eye condition in violation of his rights under the Eighth Amendment to the United States Constitution. Defendants William Pollard, J. Zwiers, Tom Gozinske, Ismael Ozanne, Cynthia Thorpe, and Cathy Francois ("DOC defendants") have filed a motion for summary judgment. Defendant Dr. James Richter ("Dr. Richter"), who is represented by separate counsel, has also filed a motion for summary judgment. For the reasons explained below, the defendants' motions will be granted.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS[1]

At all times relevant to the allegations in the complaint, Johnson was an inmate at Green Bay Correctional Institution ("GBCI"). At all times relevant, William Pollard was the Warden at GBCI; Jeananne Zwiers was the Health Services Unit Manager at GBCI; Tom Gozinske was a Corrections Complaint Examiner; Ismael Ozanne was the Deputy Secretary of the Wisconsin Department of Corrections ("DOC"); Cynthia Thorpe was employed by the DOC as the Health Services Nursing Coordinator; and Catherine Francois was the Institution Complaint Examiner at GBCI. Dr. Richter

---

[1] Facts are taken from the DOC defendants' Proposed Findings of Fact and from Dr. Richter's Proposed Findings of Fact. The defendants' proposed facts are undisputed.

has been a licensed optometrist in the State of Wisconsin since 1973. He provides optometry care to inmates in correctional facilities throughout northeast and north central Wisconsin.

### 1. Chronology of Johnson's Relevant Medical Care

Dr. Richter first saw Johnson as a patient on November 25, 2009, which consisted of a full, dilated eye examination. The exam revealed that Johnson's eyes were normal, with his only complaint being a slight blur when seeing at a distance (nearsightedness) in each eye. As a result of that examination, Dr. Richter prescribed glasses for Johnson.

The second time Dr. Richter saw Johnson was on April 16, 2010, which was based on a referral from Dr. Heidorn, who had seen him on April 14, 2010, after Johnson submitted a Health Services Request ("HSR") to the Health Services Unit ("HSU") complaining of lumps in his eyes causing pain. (Lutsey Decl. ¶ 8, Exh. A at 0001.) Dr. Heidorn had prescribed Gentamycin, an ophthalmic solution, and recommended that Johnson see Dr. Richter on April 16, 2010. That day, Johnson informed Dr. Richter that he had an enlargement under each eyelid, and he flipped his eyelids up to demonstrate this condition. Dr. Richter observed that both lacrimal glands (for tear production) were enlarged, the left more than the right, and were red as if irritated. Johnson informed Dr. Richter that as a result of the lumps under both eyelids, his eyelids were becoming sore and he was having pain radiating into the surrounding tissue resulting in a headache. Johnson indicated to Dr. Richter that this had started four months before. Dr. Richter was not able to locate any earlier requests for care in that time frame aside from the April 14, 2010, visit with Dr. Heidorn two days earlier. Johnson informed Dr. Richter that he was flipping his eyelids up daily and looking at them which, in and of itself, can lead to irritation. Johnson had no other complaints, no red eyes, no discharges, and demonstrated vision at 20/40 in the right eye and 20/30 in the left eye (unaided). He

did not have an eye ache or pain behind the eyes, but reported a discomfort from the eyelids and obviously affected surrounding tissue.

Dr. Richter discontinued the antibiotics because he believed that the condition did not appear to be an infection and, instead, prescribed a steroid drop (Prednisolone) four times a day for one week, to be slowly tapered over four weeks. Dr. Richter made an appointment to have Johnson back in approximately one month to review his status and recorded in his Progress Note that if Johnson demonstrated no response to the steroid treatment at that time, he would refer him to University of Wisconsin ("UW") Eye Clinic for evaluation.

Dr. Richter next saw Johnson on May 7, 2010. He observed that Johnson looked the same to him, showing no improvement or any worsening. His visual acuity was noted at 20/20 in both eyes (unaided). Johnson demonstrated no change in appearance and his discomfort level was the same. He did not ask for pain medication but, because the enlargement of the lacrimal glands had not improved, consistent with Dr. Richter's Progress Note of April 16, 2010, Dr. Richter set in motion the process to refer him to UW Eye Clinic. It was Dr. Richter's opinion that this was the best choice, as that clinic sees the most varied cases. Johnson was then scheduled for the first available appointment with a UW Health Ophthalmologist, which was on July 28, 2010.

As of May 7, 2010, Johnson's condition still appeared to be a localized lid area problem, with some discomfort, which was unchanged from three weeks earlier despite the steroid medication. When Dr. Richter recommended referral to the UW Eye Clinic, it was his professional opinion that what Johnson had was a surface problem involving the eyelids with resulting headache in the immediate area of the eyelids from that condition. He did not believe that Johnson's situation was

an emergency but that it was a situation which could and should be handled in the normal course of referrals to UW Eye Clinic in Madison.[2]

On June 1, 2010, HSU received a HSR from Johnson. This was a request for information; Johnson did not ask to see a health service staff member in this request. Jamie Wertel, Medical Program Associate Assistant, responded to Johnson's HSR that day, informing him that because he was a new patient to the UW eye clinic, his appointment would be in a couple months. Wertel further noted that there was no indication from Dr. Richter that Johnson needed to be scheduled sooner than the first available appointment. Johnson submitted another HSR, received on June 2, 2010, asking to see a health service staff member. In the explanation section of the request, Johnson wrote as follows:

> I'm writing you for the 2nd time, concerning my eyes. I sent you a request on 5-30-10 telling you about the pain coming from my eyes. I woke up this morning and I have a hard time seeing out of the left side of my eye. I need to see someone as soon as possible. This has been an on-going issue.

(Lutsey Decl. ¶ 18, Exh. E at 0001.) Jamie Wertel forwarded Johnson's request to Dr. Richter.

Dr. Richter's next involvement in Johnson's case was on June 4, 2010, when Dr. Richter was made aware by the HSU staff that they had received a request on June 1, 2010 from Johnson as to when his appointment would be, and again on June 2, 2010, about his ongoing complaints. On June 4, 2010, Dr. Richter reviewed the chart and the recent Health Service request regarding Johnson's complaints and concluded that it was appropriate to have him wait for his then scheduled UW Eye Clinic appointment, since his lacrimal gland condition was better suited for a speciality consultation

---

[2]     The DOC/HSU system and protocol for referring new patients to the UW Clinic, including the UW Eye Clinic, is that they be referred out for the first available appointment if not an emergent or urgent situation. It will often take longer for such new, nonemergent, nonurgent patients to be seen for the first available appointment than individuals who are already patients at UW, since appointments for existing UW patients are typically set for the next ensuing visit once the patient is in the system at UW.

and whatever plan of care UW would recommend. A review of the June 6, 2010 documentation demonstrates that the staff reviewing Johnson's request felt that his symptoms had not changed since May 7, 2010. Based on that analysis, Dr. Richter's professional judgment was that unless the symptoms had changed, which they had not, it was best to stick with the scheduled appointment at UW Eye Clinic. As of that point, June 4, 2010, it remained Dr. Richter's opinion that this was an external eyelid problem, not some type of claim of interior eyeball pain. Up to that point, Johnson had never told Dr. Richter that he was in extreme pain or that he was experiencing any significant blurring or loss of vision.

The next visit that Johnson had to the DOC Health Clinic was on or about June 22, 2010, at which point he was reporting a clear change in his visual symptoms, which included pain behind the left eyeball, blurriness to the point of almost darkness for a few seconds when he had been outside, but no further similar incidents since. He was instructed by HSU to keep track of such incidents and that they would contact Dr. Richter if problems got worse or persisted and to immediately contact HSU in such an event. At that point, HSU, given these new completely different and changed symptoms from May 7, 2010, made an appointment locally on an urgent basis to have this problem addressed, with Tower Clock Eye Center in Green Bay, Wisconsin, and Johnson was referred there. At no point on June 22, 2010 or thereafter was Dr. Richter contacted about Johnson's new and changed symptoms because there was a staff physician who was the on-site decision maker at that point in time. Despite Dr. Richter not having been contacted on or about June 22, 2010 with regard to this clear change in symptomatology, HSU nevertheless made the appropriate referral to a local ophthalmologist.

Between June 22, 2010 and July 6, 2010, Dr. Richter never saw Johnson, was not consulted in any manner by HSU with regard to him, nor was he contacted by telephone in that time frame

with regard to him. The HSU scheduled an appointment for Johnson to see Ophthalmologist Matthew Thompson at Tower Clock Eye Center on July 6, 2010. During that appointment, Dr. Thompson determined that Johnson had papilledema and needed to go to the emergency room. Johnson was then admitted to St. Vincent Hospital for an MRI scan and neurology consult. He remained at St. Vincent for evaluation and treatment until July 8, 2010. Johnson's MRI/MRA of the brain showed that he had left optic neuritis. (Lutsey Decl. ¶ 26, Exh. F at 0001.)

On July 11, 2010, Johnson was seen in HSU and reported that his vision was nearly back to "how it used to be." (Lutsey Exh. A at 0005.) On July 13, 2010, Johnson was seen in HSU by Dr. Paul Sumnicht who noted that Johnson's optic neuritis appeared to be better. (Lutsey Decl. ¶ 27, Exh. A at 0006-0007.) Dr. Sumnicht ordered a follow-up with Tower Clock Eye Center in thirty days as well as follow-up by Dr. Richter regarding the left optic neuritis.

On July 21, 2010, HSU received an HSR from Johnson related to his eye. In the description section of the HSR, Johnson wrote as follows:

> I'm writing because I need to see the eye doctor soon as possible, or Health Service Nurse. My eye condition has returned, and I can't see out my left eye. Also I'm in a lot of pain because of this condition. Please call me over as soon as possible.

(Lutsey Decl. ¶ 29, Exh. G at 0001.) That day, Nurse Vanderkinter saw Johnson in the HSU. In the progress notes from the appointment, Vanderkinter noted that Johnson had Tylenol and Ibuprofen in his cell and she advised him to take the medications for comfort. She also informed Johnson that he would be seen at Tower Clock Eye soon for follow-up. (Lutsey Decl. ¶ 30, Exh. A at 0010.)

On July 23, 2010, Johnson was returned to Tower Clock Eye Center (Dr. Matthew Thompson), at which point he was reporting increased pain in his left eye for the previous week, that his pain medication was of no help and, apparently, "flashes" in the left eye with occasional dizziness. Documentation indicates that Dr. Thompson's differential diagnoses that day were optic

- 7 -

neuritis, orbital pseudotumor, optic pathway glioma, or sarcoidosis. This documentation also indicates that given the course that Dr. Thompson had seen, he expressed "doubt" that this was optic neuritis, and he felt that Johnson needed further workup. On that same date, Dr. Richter was sent a copy of Dr. Thompson's recommendation that Johnson needed to see neurology and that Johnson should follow up with Dr. Thompson in one month. That day, Dr. Richter signed off on this recommendation, thus forwarding Dr. Thompson's opinion that the patient should see neurology onto the scheduling people to set that process in motion. Dr. Richter also wrote a separate order to this effect the same day.

On July 26, 2010, HSU received an HSR from Johnson related to his eye. (Lutsey Decl. ¶ 33, Exh. I at 0001.) Nurse Nicole Mathweg saw Johnson for an appointment in the HSU that day. In the progress notes from the appointment, Mathweg noted that Johnson was complaining of head and eye pain and that he wanted to know when he would be seeing the eye doctor. Nurse Mathweg recommended that Johnson continue using Ibuprofen and Tylenol and ice as needed. She also informed Johnson that he was scheduled to see the UW eye doctor later in the week.

On July 28, 2010, Johnson was transported to UW Health for his off-site specialty consultation with Ophthalmologist Dr. David Lewis. Dr. Lewis noted in his summary of the appointment to Dr. Richter that Johnson's "visual acuity uncorrected in the right eye was 20/25+1 and in the left eye was hand motion." Dr. Lewis further noted that Johnson has "optic neuritis with a few dot-blot heme in the left eye, more chronic and progressive and atypical for demyelinating disease." Dr. Lewis recommended a repeat MRI with additional laboratory work. He further recommended awaiting test results before undergoing another round of steroids. Dr. Lewis ended his report by noting that "[t]his is a very atypical case." (Lutsey Decl. ¶ 36, Exh. J at 0001-0002.)

On August 5, 2010, Johnson submitted another HSR related to his eye. In the description section of the HSR, Johnson wrote as follows:

> I just got back from Madison Hospital today, I went and had a MRI. I was wondering what's next for me because I still have the same Eye Condition. I was wondering could you let me know what's going on. My eye is still in a lot of pain. I still take the Tylenol, and Ibuprofen.

(Lutsey Decl. ¶ 37, Exh. K at 0001.) That day, an HSU staff member responded to Johnson's HSR. In the written response he informed Johnson that the MRI report was not yet available, but that Johnson would be going to the local eye clinic very soon for follow-up. Also on that same day, Johnson was seen for another off-site consult by Dr. Thompson at Tower Clock Eye Center. Dr. Thompson recommended that Johnson continue to follow-up with neurology and/or neuro-ophthalmology for diagnosis.

On August 6, 2010, HSU received a phone call from UW Health informing HSU that Dr. Lewis at UW Health would like Johnson to be admitted to UW Health for his optic neuritis. Johnson was transferred to University of Wisconsin Hospital and Clinic (UWHC) that day for further evaluation and treatment of his eye. Johnson remained at UWHC from August 6 - 13, 2010. Doctors performed a large variety of tests and evaluations of Johnson during his hospital stay. They obtained consultations from ophthalmology and neurology. Both agreed the optic neuritis was most likely due to sarcoidosis, but confirmation would require lumber puncture and tissue biopsy. Sarcoidosis is the growth of tiny collections of inflammatory cells in different parts of the body—most commonly the lungs, lymph nodes, eyes, and skin. Doctors believe sarcoidosis results from the body's immune system responding to an unknown substance, most likely something inhaled from the air. There is no cure for sarcoidosis, but most people do very well with modest treatment. Sarcoidosis often goes away on its own. Alternatively, signs and symptoms of sarcoidosis may last for years and sometimes

lead to organ damage. (Lutsey Decl. ¶ 42, Exh. M at 0003.) In response to UWHC recommenda-

tions, HSU at GBCI prescribed the recommended medications and course of treatment. The day after

Johnson's discharge from UWHC, Johnson was seen by Nurse Mathweg in the HSU as a follow-up

to the hospitalization. Nurse Mathweg provided Johnson with medication instructions. She also

noted Johnson continued to use sunglasses and he was given permission for ice as needed.

On August 17, 2010, Johnson was again seen in the HSU as further follow-up to his UWHC

hospitalization. (Lutsey Decl. ¶ 45, Exh. A at 0012-0013.) On August 24, 2010, Johnson was

transported to UW-Station-Ophthalmology for an off-site neurological appointment with Dr. Ivy

Dreizin. In the impression section of the summary from the appointment, Dr. Dreizin noted as

follows:

> IMPRESSION: Mr. Johnson has optic neuritis and perineuritis. It is probably due to
> sarcoidosis; Most of the other common causes for perineuritis have been ruled out. As
> you know, patients with optic perineuritis often require steroids for longer times than
> patients with optic neuritis. And patients with sarcoidosis often require steroids for
> many months. I am glad that Mr. Johnson is doing this well. I would like him to
> continue to taper his medicines as recommended. He should return for follow-up in
> a month or sooner if needed.

(Lutsey Decl. ¶ 46, Exhibit N at 0002.) As a result, on August 30, 2010, Johnson was issued a

continued prescription for Prednisone, 80 mg per day for one month.

On September 6, 2010, HSU received an HSR from Johnson requesting an eye patch and to

be fitted with tint lenses. (Lutsey Decl. ¶ 48, Exh. O at 0001.) Nurse Lemens informed Johnson that

day he would be seen within one week. On September 8, 2010, Johnson was transported off-site for

a UW-Station Ophthalmology appointment with Dr. Lewis. In the progress notes from the

appointment, Dr. Lewis noted that Johnson's vision and edema improved. (Lutsey Decl. ¶ 50, Exh.

P at 0001.)

Johnson has continued to receive regular evaluation and treatment for his eye condition. For example, for the time period of October 1, 2010 through October 2, 2013, Johnson's optical treatment included the following: over fifteen appointments with UW specialists, two MRIs, five hospital admissions, and frequent appointments with DOC doctors and nurses.

### 2. Offender Complaint GBCI-2010-11717

The crux of the alleged delay by Zwiers, Francois, Thorpe, Gozinske and Ozanne is the decisions they made with respect to Johnson's prison grievance, GBCI-2010-11717. Warden Pollard was not a treating medical provider for Johnson, and Pollard did not participate in the ICRS decision making process for GBCI-2010-11717. The parties stipulate to the dismissal of Pollard. (Docket # 54 at 5 n.1.)

The DOC maintains an Inmate Complaint Review System ("ICRS") in Wisconsin adult correctional facilities. The purpose of the ICRS is to afford inmates in adult institutions a process by which grievances may be expeditiously raised, investigated, and decided. As Institution Complaint Examiner ("ICE") at GBCI, it was defendant Francois' responsibility to acknowledge and investigate ICRS complaints submitted by GBCI inmates. Based on Francois' investigation, she would make a recommendation of the complaint to the appropriate reviewing authority, who would then render a decision.

Johnson submitted one offender complaint, GBCI-2010-11717, with the ICE related to concerns about medical treatment of his eye. He signed his complaint on June 6 and it was received by the ICE office on June 7, 2010. In GBCI-2010-11717, Johnson wrote:

> On 4/11/10, I submitted a DOC-3035 Health Service Request (DOC-3035 Form) to the Health Service Unit (HSU) requesting medical attention for the pain I was experiencing from the rear of my eyes. I also wrote I had a hard time seeing. On 4/12/10, HSU returned the DOC-3035 form to me the form made no indication that I would receive medical treatment for my eye condition. However, on 4/19/10, HSU

- 11 -

sent me a DOC-3035 form articulating a system for administering Predmild 0.12% eye drops. The form stated I would be receiving the eye drops in the near future. When the eye drops failed to have an effect on the pain I continued to experience in my eyes, I contacted HSU again on 5/21/10, complaining about the pain I was having, and asked about the off-ground optical appointment I was told about by Dr. Richter. On 6/1/10, HSU forward the DOC-3035 form back to me. HSU informed me that Dr. Richter had scheduled me for an optical appointment with UW EYE Clinic, but that since Dr. Richter had not indicated that my eye condition didn't warranted [sic] priority treatment, and that it would be several months before I see the off-ground doctor. On 6/2/10, I received another HSU DOC-3035 form back stating, I would see Dr. Richter the first week of June. I never seen him.

Dr. Richter [sic] failure to schedule me for a prompt eye examine has delayed medical treatment for my eye problem and the delay violates my 8th Amendment right to be free from cruel and unusual punishment because the delay has caused me to suffer unnecessary pain and to experience continual vision loss. With each passing day, my vision deteriorates. My fear is that if my condition is not treated soon and is allowed to run it's course I will go blind. The fear of me going blind is causing me major stress to the extent that I have been unable to eat, or sleep. I fear if I go to sleep for to [sic] long I might awake blind.

Since HSU, and Dr. Richter, and Ms. Zwiers has refused to take adequate measures to prevent my condition from deteriorating and from me going blind, I'm pleading with the ICE office to make someone provide me with prompt medical treatment for my medical need.

(Francois Decl. ¶ 8, Exh. B at 0001-0002.) Francois received and investigated complaint GBCI-2010-11717. Because this was a medically related complaint, she first contacted the Health Services Manager, defendant Zwiers, for more information.

When investigating medical complaints, the ICE lacks the expertise to evaluate the diagnosis and course of treatment determined by trained medical professionals. However, the ICE does investigate medical complaints to ensure that the treatment offered appears adequate to the demonstrated need. For complaint GBCI-2010-11717, defendant Zwiers reviewed Johnson's file and informed defendant Francois that Johnson was scheduled for on off-site eye consultation with UW Health. Based on the information received from Zwiers, Francois was satisfied that Johnson's concerns were being addressed by medical staff.

- 12 -

Francois recommended dismissal of complaint GBCI-2010-11717 on June 11, 2010. In the Summary of Facts section of the ICE report from complaint GBCI-2010-11717, Francois wrote:

> Inmate Johnson complains that Dr. Richter failed to schedule him for a prompt eye exam and has delayed medical treatment for his eye problem. Mrs. Zwiers, HSU Manager, reviewed the inmate's medical file and said that the inmate was informed via a DOC-3035 that arrangements were made for him to [go to] Madison for an eye appointment. He is currently scheduled for that appointment.
>
> Though the complainant says he is being denied appropriate care, it is clear from the record no such denial is, nor has taken place. The complainant has made it clear he is not satisfied with the care being offered to date, but what type of specific care or treatment must be offered is a matter of professional medical judgment. Those judgments have been made as they relate to the complainant's concerns and through the filing of this complaint, they have also been reviewed by others in the Bureau of Health Services. Under these circumstances, the ICE has no reason to believe the care and treatment offered is not adequate to the demonstrated need.

(Francois Decl. ¶ 12, Exh. B at 0004.)

Once a recommendation is made for a medically related complaint, the ICRS process then forwards the matter to the Regional Nursing Coordinator for review. In this case, the Regional Nursing Coordinator for medically related complaints was defendant Thorpe, who reviewed Francois' recommendation on complaint GBCI-2010-11717. As Reviewing Authority, Thorpe reviews the file related to the complaint and makes one of the following decisions: (1) dismiss the complaint; (2) dismiss the complaint with modifications; (3) affirm the complaint; (4) affirm the complaint with modifications; or (5) return the complaint to the ICE for further investigation. (Thorpe Decl. ¶ 5.) Thorpe's standard procedure when reviewing and investigating inmate complaints was to: (1) ensure that the ICE appropriately investigated the complaint, (2) review the inmate's medical record, and (3) personally discuss the case with a member of the HSU at the appropriate institution. (Thorpe Decl. ¶ 6.)

Based on Thorpe's review and investigation of complaint GBCI-2010-11717, she dismissed the complaint, with modification, on June 14, 2010. In the Reason(s) for Decision section of her decision, she wrote the following:

> In reviewing this case, patient should have been seen on date of HSR to triage eye pain as described in HSR to ensure that this was not an eye emergency. However, after being seen by nurse and MD was referred to optometrist. Patient has been scheduled for referral. If new symptoms occur patient should be submit HSR to be assessed. No co-pay would apply.

(Thorpe Decl. ¶ 9; Francois Exh. B at 0005.) When a medically related complaint is dismissed with modification, the modification is sent back to the institution ICE and HSM for their information.

After Thorpe dismissed, with modification, complaint GBCI-2010-11717, Johnson submitted a Request for Corrections Complaint Examiner Review, received on June 22, 2010. In the Request for Corrections Complaint Examiner Review, Johnson wrote the following:

> I have an 8th Amendment right to be free from the unnecessary pain, and prison officials have a duty to ensure I receive prompt health car [sic]. I have continually experienced pain in my left eye, and vision loss. My constant pain and vision deprivation results from prison officials delaying the necessary medical treatment my eye condition warrants.
>
> I have informed prison officials that their delay in treating my eye condition has allowed my eye condition to worsen, but prison officials continue to ignore my eye condition by relying on a scheduled eye appointment. I believe that if I wait until my eye appointment I could lose my eye sight in my left eye, and I request that this office order my eye condition be immediately treated.

(Francois Decl. ¶ 11, Exh. B at 0006-0007.)

The Corrections Complaint Examiner ("CCE"), defendant Gozinske, received and investigated the request for review of complaint GBCI-2010-11717. Gozinske contacted defendant Thorpe for more information. Based on the information he received from Thorpe, Gozinske recommended dismissal of the request for review of complaint GBCI-2010-11717 on June 24, 2010. In the CCE's Recommendation section of the CCE Report, Gozinske wrote the following:

> In discussion with Ms. Thorpe regarding inmate Johnson's situation, this examiner was informed that his sight is not in jeopardy, that he was not complaining of eye pain the last time he was seen, and that he is scheduled with an Ophthalmologist in the near future. Based on that, it is recommended this appeal be dismissed.

(Thorpe Decl. ¶ 15; Francois Decl. ¶ 20, Exh B at 0009.) On behalf of the Secretary, defendant Ozanne reviewed and accepted Gozinske's recommendation and dismissed the review of complaint GBCI-2010-11717 on July 24, 2010.

With respect to the events at issue in this case, the only personal involvement of Zwiers, Francois, Thorpe, Gozinske, and Ozanne was their participation in recommendations and decisions on Johnson's complaint GBCI-2010-11717. Zwiers, Francois, Thorpe, Gozinske, and Ozanne were not Johnson's treating medical providers.

## DISCUSSION

### 1. Deliberate Indifference to a Serious Medical Need Standard

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009)); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *Id.* at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 103).

"A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue – the sorts of ailments for which many people who are not in prison do not seek medical attention – does not by its refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Elyea*, 631 F.3d at 857. Deliberate indifference "'is more than negligence and approaches intentional wrongdoing.'" *Arnett*, 658 F.3d at 751 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

"'A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Elyea*, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 759 (citing *Greeno*, 414 F.3d at 653). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Id.* (quoting *Greeno*, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

## 1.1   DOC Defendants

The DOC defendants contend that Johnson cannot establish that he had a serious medical need or that they acted with deliberate indifference. According to the defendants, they were not deliberately indifferent because their involvement was limited to the ICRS process and they relied on medical professionals' recommendations. Johnson contends that he did have a serious medical need and that the DOC defendants were deliberately indifferent because they knew of Johnson's pain and loss of eyesight but did not take steps to provide the required specialty care.

If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. *Arnett* 658 F.3d at 755 (citing *Greeno*, 414 F.3d at 656).

> This [distinction] follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Id.* (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

However, "nonmedical officials can 'be chargeable with . . . deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Id.* (quoting *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008)). Non-medical prison officials cannot simply ignore an inmate's plight. *See Greeno*, 414 F.3d at 656 (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns"); *see also Berry*, 604 F.3d at 440 ("As a nonmedical administrator, [defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate]."). Mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient. *Arnett*, 658 F.3d at 755 (citing *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)). Rather, the plaintiff must demonstrate that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Id.* (quoting *Vance*, 97 F.3d at 993). Once an official is alerted of such a risk, the "refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.*

In this case, the DOC defendants investigated Johnson's offender complaint and ultimately concluded that it should be dismissed with modification. The crux of Johnson's June 6, 2010, offender complaint was Dr. Richter's failure to schedule him for a specialty eye exam sooner than July 28, 2010. The DOC defendants investigated the charges and determined that Johnson was receiving appropriate medical care. Their decision was based on Johnson's condition at the time he filed the offender complaint, and not subsequent developments. In Thorpe's June 14, 2010 decision dismissing the offender complaint, she advised Johnson to submit an HSR if new symptoms occurred.[3]

The DOC defendants were entitled to rely on Dr. Richter's decision that the eye specialist appointment was appropriately scheduled. Although Zwiers and Thorpe may be considered medical professionals given their positions as Health Services Manager and Regional Nursing Coordinator, they were also entitled to rely on Dr. Richer's decision regarding the date of the appointment given Dr. Richter's position as an optometrist. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[Inmate's] contention that any public employee who knows (or should know) about a wrong must do something to fix it is just an effort to evade, by indirection, *Monell's* rule that public employees are responsible for their own misdeeds but not for anyone else's."). "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." *Id.* Accordingly, I will grant the DOC defendants' motion for summary judgment.

---

[3] Johnson requested to see the HSU shortly thereafter. On June 22, 2010, he was seen in the HSU and based on his change in symptoms, i.e., new area of pain and significant vision loss, it was determined that he needed a specialty eye appointment sooner than the scheduled UW appointment.

## 1.2 Dr. Richter

Dr. Richter contends that Johnson lacks evidence that he was deliberately indifferent to a serious medical need. According to Dr. Richter, he made appropriate referrals based on the symptoms Johnson had at the time that he saw Johnson and there is no link between his involvement and Johnson's later symptoms. Dr. Richter further contends that he did not delay any treatment.

On the other hand, Johnson contends that a reasonable factfinder could conclude that Dr. Richter was deliberately indifferent to his serious medical need. According to Johnson, Dr. Richter knew of his loss of eyesight and pain on June 4, 2010, yet he did nothing to promptly obtain the specialty care he recognized that Johnson required. Johnson asserts that on June 4, 2010, Dr. Richter knew that, (1) Johnson had been complaining of lumps in his eyes for at least five months, (2) the treatment he administered on April 16 and May 7 had not relieved the enlarged lacrimal glands or the pain Johnson was suffering, and (3) Johnson would "need" to wait still months before he would receive the specialty consultation that Dr. Richter finally thought was required.

As a medical professional, Dr. Richter is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under [the] circumstances" at issue. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citing *Elyea*, 631 F.3d at 857). When a medical professional acts in his professional capacity, he "'may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Id.* (quoting *Elyea*, 631 F.3d at 857). "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts."

*Duckworth*, 532 F.3d at 679; *see also Greeno*, 414 F.3d at 653 ("neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference").

The facts in this case are undisputed. Other than a routine eye exam in November 2009, Dr. Richter saw Johnson twice at GBCI relative to treatment for his eyes. At the first appointment, on April 16, 2010, Johnson had lumps under his eyelids causing pain. Dr. Richter prescribed a steroid eye drop and made an appointment to see Johnson again in one month. Dr. Ricther noted that he would refer Johnson to the UW Eye Clinic if his symptoms had not improved by then.

Dr. Richter saw Johnson three weeks later on May 7, 2010. Johnson's symptoms were about the same: his vision was slightly better, he showed no change in appearance, and his discomfort level was the same. Dr. Richter therefore referred Johnson to the UW Eye Clinic for their next available appointment, which was on July 28, 2010. At this time, Dr. Richter believed that Johnson had a surface problem involving his eyelids. He believed that Johnson's eye issue could be handled in the normal course of referrals. Dr. Richter did not think that Johnson presented with an emergency situation that needed immediate referral to the UW Eye Clinic.

Dr. Richter's third and final involvement was on June 4, 2010. He did not see Johnson but rather HSU staff told him that they had received requests from Johnson on June 1 and 2, 2010 about his "ongoing complaints." In his June 2, 2010 HSR, Johnson complained of "pain coming from my eye" and that when he woke up that morning he had "a hard time seeing out of the left side of [his] eye." Dr. Richter reviewed Johnson's chart and the recent requests. Based on his review, he determined that it was best to stick with the scheduled July 28, 2010 UW Eye Clinic appointment. According to Dr. Richter, it remained his opinion that Johnson had an external eyelid problem. Johnson did not complain that he was in extreme pain or that he was experiencing any "significant

blurring or loss of vision." Dr. Richter determined that because his symptoms had not changed, they would stick with the already-scheduled appointment.

Based on subsequent events, it may have been beneficial if Johnson's appointment to the UW Eye Clinic had been made sooner. Johnson contends that a jury could conclude that Dr. Richter's failure to do so was deliberately indifferent. However, there is nothing in the record to support a finding that Dr. Richter's referral or the timing of the referral was so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment. *See Arnett*, 658 F.3d at 758-59 (citing *Duckworth*, 532 F.3d at 679); *cf. Gil*, 381 F.3d at 663 & n.3 (finding deliberate indifference where the prison doctor prescribed a drug that worsened inmate's condition because the appropriate drug was not part of the BOP's formulary); *Greeno*, 414 F.3d at 654 (finding deliberate indifference where medical defendants would not alter Greeno's course of treatment over a two year period even though his condition was getting worse and he was vomiting on a regular basis and the defendants nevertheless persisted in a course of treatment known to be ineffective).

In this case, there is no evidence in the record to indicate that, at any time, or for any reason before June 22, 2010, when Johnson did report potentially significant changes in symptoms, he should have been sent out for a more immediate/urgent expert consultation. (Once those symptoms were reported, on June 22, 2010, HSU immediately began the process of referring him out.) Without some evidence, such as expert opinion testimony, creating a reasonable inference that Dr. Richter's treatment during this time frame was so inadequate that it demonstrated an absence of professional judgment, Johnson cannot succeed against him on summary judgment. *See Arnett*, 658 F.3d at 758-59. Therefore, I will grant Dr. Richter's motion for summary judgment.

**NOW, THEREFORE, IT IS ORDERED** that the defendants Pollard, Zwiers, Gozinske, Ozanne, Thorpe, and Francois' motion for summary judgment (Docket # 44) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Dr. Richter's motion for summary judgment (Docket # 47) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing this action.

Dated at Milwaukee, Wisconsin this 23rd day of February, 2015.

BY THE COURT

 s/ *Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge